UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEVIN LOPEZ-DELGADO, | ) | CASE NO. 3:23-cv-51 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WATSON, *et al.*, | ) | JUNE 10, 2024 |
| *Defendants*. | ) | |

<u>**MEMORANDUM OF DECISION**</u>
<u>**RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 36)**</u>

Kari A. Dooley, United States District Judge:

Plaintiff Kevin Lopez-Delgado ("Lopez-Delgado") filed this civil rights action pursuant to 42 U.S.C. § 1983. Following initial review, only his Eight Amendment claims for excessive force against Captain Watson and Officers Chiz, Badillo, and Dobrzycki ("Defendants") in their individual capacities remain. Defendants have filed a motion for summary judgment on the grounds that Lopez-Delgado did not properly exhaust his administrative remedies and fails to state a cognizable claim for use of excessive force, and that Defendants are otherwise protected by qualified immunity. For the following reasons, the motion for summary judgment is GRANTED in part. (ECF No. 36)

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the

substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense. . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the Court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the Court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts**[1]

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.
 Lopez-Delgado objects to many of Defendants' statements on the ground that he lacked access to review the video footage. In response, Defendants attest that Lopez-Delgado was afforded another opportunity to view the footage. However, Lopez-Delgado did not file an amended Local Rule 56(a)2 Statement after this second viewing.

On December 16, 2021, Lopez-Delgado was being escorted to the restrictive housing unit ("RHU") after pruno, a prohibited fermented beverage made by inmates, was found in his cell. Defs.' Local Rule 56(a)1 Statement ("LRS"), ECF. No. 36-2 at 1 ¶ 1. Department of Correction directives require that inmates undergo a strip search before being admitted to RHU. *Id.* at 2 ¶ 6.

Defendants escorted Lopez-Delgado to a room to conduct the strip search. *Id.* at 1 ¶ 5. Lopez-Delgado was twice ordered to lock his knees, bend forward at the waist, and spread his buttocks, but refused both orders. *Id.* at 2 ¶¶ 7–9. Lopez-Delgado stated that he had not been ordered to do this on a previous admission to RHU and threatened to harm Defendants. *Id.* at ¶¶ 9, 11.

Defendants then handcuffed Lopez-Delgado, partially dressed him, and escorted him to an RHU cell to perform a controlled strip search. *Id.* at ¶¶ 12–13. During a controlled strip search, correctional officers maintain hands-on physical control of the inmate through use of restraints or approved restraint techniques. *Id.* at ¶ 13.

 Lopez-Delgado was placed in a kneeling position on a mattress which was placed partly on the bunk and partly on the floor. *Id.* at 3 ¶ 15. Officer Badillo was holding Lopez-Delgado's right arm. *Id.* at ¶ 14. Officer Chiz was not touching Lopez-Delgado. *Id.* at ¶ 16.

Lopez-Delgado's boxers were taken down and he was directed to sit back so the officers could conduct a controlled strip search. *Id.* at ¶ 17. Lopez-Delgado began to struggle with the officers holding him, kicking with his legs and lifting his torso from the bunk. *Id.* at ¶ 18. While Lopez-Delgado was struggling, Captain Watson administered a chemical agent. *Id.* at ¶ 19. Officer Badillo continued to hold Lopez-Delgado's right arm, and Officer Dobrzycki was on

---

Defendants' facts, where supported by the evidence of record, are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions. . . .").

Lopez-Delgado's left side with his right hand on the handcuffs and his left hand on Lopez-Delgado's left shoulder. *Id.* at ¶¶ 20–21. Officer Badillo cannot be seen on the video footage as he was the farthest from the camera. *Id.* at ¶ 22. Captain Watson administered a second burst of the chemical agent, but the timing cannot be determined from the video footage. *Id.* at 3–4 ¶¶ 23–24.[2]

Officers Chiz, Badillo, and Dobrzycki state that they did not put their body weight on Lopez-Delgado's torso and did not see anyone else do so; while not conclusive on this question, the video does not reveal otherwise and, in fact, appears consistent with these averments. Captain Watson's body briefly obstructs the camera in the video footage, however. *Id.* at 4 ¶¶ 27–29.

After the second burst of the chemical agent, Lopez-Delgado complained of difficulty breathing and repeatedly said that he had asthma. *Id.* at ¶ 30. Officers assisted Lopez-Delgado in standing and took him to the showers for decontamination. *Id.* at ¶ 31. Officers placed Lopez-Delgado in a different RHU cell and his handcuffs were removed. *Id.* at 4–5 ¶¶ 32–33. A nurse came to the cell and evaluated Lopez-Delgado. *Id.* at 5 ¶ 34. After Lopez-Delgado used an inhaler twice, the nurse said, "He's clear." *Id.*

Lopez-Delgado filed a grievance which was rejected on March 2, 2022. *Id.* at 5 ¶¶ 35–37. The rejection informed Lopez-Delgado that he had five calendar days to correct and resubmit the grievance. *Id.* at ¶ 37. Lopez-Delgado's corrected grievance is dated March 3, 2022, but was not logged as received until March 14, 2022. *Id.* at ¶¶ 38, 40. Lopez-Delgado stated in his deposition that he did not know what day he filed the grievance. *Id.* at ¶ 39. The corrected grievance was rejected as untimely filed. *Id.* at 6 ¶ 44.

---

[2] The Court may accept as true facts that are supported by video footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

4

**Discussion**

Defendants move for summary judgment on the grounds that Lopez-Delgado did not properly exhaust his administrative remedies, fails to state a cognizable claim for use of excessive force, and that they are otherwise protected by qualified immunity.

*Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion": the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also*

5

*Day v. Chaplin*, 354 F. Appx. 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, No. 14-cv-6606 (RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("The law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The Supreme Court has held that the requirement for proper exhaustion is not met when a grievance is not filed in accordance with the deadlines established by the administrative remedy policy. *Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95). In addition, exhaustion of administrative remedies must be completed before the inmate files suit. *Baez v. Kahanowicz*, 278 F. Appx. 27, 29 (2d Cir. 2008). Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001).

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved inmates." *Id*. at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the Court is guided by these illustrations. *See Mena v. City of New York*, No. 13-cv-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

 Exhaustion of administrative remedies is an affirmative defense. Thus, the defendant bears the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendant puts forth evidence that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must put forth evidence that administrative remedy procedures were not available to him under *Ross*, or evidence which shows that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

 The inmate grievance procedure is set forth in Administrative Directive 9.6. *See* Ex. B, ECF No. 53-5. An inmate must first attempt to resolve the matter informally. He may attempt to verbally resolve the issue with an appropriate staff member or supervisor. A.D. 9.6(6)(a)(i)(2). If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using form CN 9601 and send the form to the appropriate staff member or supervisor. A.D. 9.6(6)(a)(i)(2-3). If an inmate does not receive a response to the written request within fifteen

business days, or the inmate is not satisfied with the response to his request, he may file a Level 1 grievance on form CN 9602. A.D. 9.6(6)(a)(ii).

The Level 1 grievance must be filed within 30 days of the occurrence, or discovery of the cause of the grievance, and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* Upon receipt, the grievance is reviewed for compliance with these rules. A.D. 9.6(6)(b)(i)(2). If the grievance is not in compliance, and the defect can be corrected, the inmate is afforded five calendar days to correct the defect and resubmit the grievance. A.D. 9.6(6)(b)(i)(2)(a)(i)(1).

Lopez-Delgado's grievance was rejected on March 2, 2022 for procedural reasons. He was afforded five calendar days, *i.e.*, until March 7, 2022, to correct and refile his grievance. Lopez-Delgado's corrected grievance is dated March 3, 2022, but was not stamped as received until March 14, 2022 and was therefore rejected as untimely.

Defendants submitted the declaration of Carlos Arvelo, the Administrative Remedies Coordinator at Cheshire Correctional Institution as of November 2022. *See* ECF No. 36-4. Thus, he was not the Administrative Remedies Coordinator at the time of this incident. Arvelo states that inmates place grievances in a locked collection box and that the grievances are collected each day. *Id.* at 3 ¶¶ 21–22. Arvelo concludes, therefore, that because the corrected grievance was stamped as received on Monday, March 14, 2022, Lopez-Delgado necessarily must have filed it by placing it in the collection box no earlier than Friday, March 11, 2022. *Id.* at ¶ 23. Lopez-Delgado admits that grievances are collected daily. *See* Pl's LRS, ECF No. 40 at 19 ¶ 42.

During his deposition, Lopez-Delgado stated that he did not know on what day he filed the grievance. However, in opposition to the motion for summary judgment, Lopez-Delgado submitted his own declaration in which he concedes that, during the deposition, he was unable to

recall when he filed the replacement grievance, but states that, after the hearing, he consulted his notes which indicated that he filed the replacement grievance on March 3, 2022. *See* Pl.'s Decl., ECF No. 40 at 24 ¶ 2. He did not submit a copy of said notes with his opposition. Thus, the record contains contradictory information regarding when the corrected grievance was placed in the collection box.

Indeed, there is confusion over the use of the word "filed." Lopez-Delgado's first grievance was dated January 10, 2022, and Arvelo refers to that grievance as filed on January 10, 2022, but the grievance was not marked as received until January 12. *Compare* ECF No. 36-4 ¶ 17, *with* ECF No. 36-6. For the corrected grievance, however, Arvelo relies on the received date to determine the filing date and states that the corrected grievance could have been filed no earlier than Friday, March 11, 2022. Under that rationale, the first grievance should have been considered filed no earlier than Tuesday, January 11, 2022.

The Administrative Directives do not define when a grievance is "filed." It provides that a grievance is "submitted" when it is placed in the collection box. A.D. 9.6(5)(e)(i). When referring to the time by which an inmate must file a grievance appeal after not receiving a response to his initial grievance, however, the Administrative Directives calculate the time from the date the initial grievance was documented in the grievance log, not the date the initial grievance was placed in the collection box. A.D. 9.6(6)(b)(ii)(2). The Administrative Directives do not indicate how the inmate should know when the grievance was documented because the grievance would not have been returned to the inmate.

In sum, although Defendants have submitted evidence that the standard practice is that grievances are collected daily during the week, and Lopez-Delgado concedes as much, they have not submitted the affidavit of the person who collected Lopez-Delgado's corrected grievance.

Thus, there is no direct evidence and only circumstantial evidence of when the corrected grievance was submitted. Nor is there direct evidence of whether it was promptly documented. The circumstantial evidence is at odds with Lopez-Delgado's affidavit and thus there is a genuine issue of material fact as to whether Lopez-Delgado properly exhausted his administrative remedies in this case. Defendants' motion for summary judgment is therefore denied as to this ground.

*Use of Excessive Force*

The controlled strip search underlying the claims in this case was conducted because Lopez-Delgado refused the command to bend at the waist and spread his buttocks during the visual strip search. This requirement has been held constitutional by the Supreme Court and its use has been acknowledge by other judges in this district. *See Bell v. Wolfish*, 441 U.S. 520, 558 n.39 (1979) (during visual body cavity search male inmates must bend over and spread buttocks for visual inspection); *see also Hill v. Tyburski*, No. 3:19-cv-1674 (JAM), 2022 WL 4448889, at *4 (D. Conn. Sept. 23, 2022) (summary judgment for defendants appropriate on claim for use of excessive force in relation to controlled strip search conducted after inmate refused to bend and spread buttocks).

Lopez-Delgado contends that Captain Watson sprayed him with a chemical agent while Officers Chiz, Badillo, and Dobrzycki forcefully held him down and that these actions caused him to experience difficulty breathing.[3] Defendants move for summary judgment on the ground that the video footage demonstrates that the force used was not excessive.

---

[3] Lopez-Delgado argues that Defendants failed to comply with prison directives regarding a planned use of physical force. The controlled strip search, however, was the direct result of Lopez-Delgado's refusal to comply with orders during the visual strip search, and the force used was in response to Lopez-Delgado's failure to follow orders during the controlled strip search. Because the use of force was not planned in advance, Lopez-Delgado's arguments in this regard are inapplicable.

An Eighth Amendment excessive force claim comprises both a subjective and an objective component. *See Sims v. Artuz*, 230 F.3d 14, 20–21 (2d Cir. 2000). The objective component focuses on the harm done to the inmate in light of contemporary standards of decency and the amount of harm required depends on the nature of the claim. *Id.* at 21. Although some degree of injury is usually required, the inmate need not show that he suffered a significant injury to state a claim for use of excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) ("[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.") (quoting *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9). The subjective component of the excessive force standard requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as a part of a 'good faith effort to maintain or restore discipline.'" *Id*. at 40 (quoting *Hudson*, 503 U.S. at 9).

The extent of an inmate's injuries is one factor the Court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Hudson*, 503 U.S. at 7. Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any effort made to temper the severity of a forceful response." *Id.* (internal quotation marks and citation omitted).

The video footage, recorded on a hand-held video camera, shows that Lopez-Delgado was kicking, twisting, and bucking to resist the controlled strip search. He was sprayed in the face with a chemical agent while officers were trying to hold his body to the bunk. Lopez-Delgado claimed to have suffered difficulty breathing from the effects of the chemical agent and

the pressure exerted by the officers holding him to the bunk. Following decontamination in the shower, a nurse administered two breaths on an inhaler and cleared him.

"[T]he use of a single burst of a chemical agent, which is not a dangerous quantity, is not 'an unacceptable means of controlling an unruly or disruptive inmate.'" *Vazquez v. Spear*, No. 12-cv-6883 (VB), 2014 WL 3887880, at *5 (S.D.N.Y. Aug. 4, 2014) (quoting *Carolina v. Pafumi*, No. 3:12-cv-163 (VLB), 2013 WL 1673108, at *2 (D. Conn. Apr. 17, 2013)). The parties agree, however, that Captain Watson deployed two bursts of the chemical agent. Captain Watson contends that the second burst was required because Lopez-Delgado turned his face away and avoided the first burst. Lopez-Delgado disagrees. Whether Lopez-Delgado did or did not turn his face away from the first burst cannot be determined from the video footage because Captain Watson's back was intermittently blocking the view of Lopez-Delgado's head. Nor is it clear at what point during the video the chemical agent was deployed, though Lopez-Delgado clearly reacts to the effects of the spray at 6:40, nine seconds after he first began to resist the controlled strip search and approximately seven seconds after Captain Watson leans into the bunk with the chemical agent in his hand. It is also clear that there is no use of a chemical agent after the 6:40 point of the video, as Captain Watson leans back and holsters the chemical agent. It appears, therefore, that the two deployments of the chemical agent occurred between the 6:33 and 6:40 on the video and were deployed at close range. Use of a chemical agent at close range can constitute excessive force. *See Ross v. Willis*, No. 16-cv-6704 (PAE)(KNF), 2021 WL 3500163, at *12 (S.D.N.Y. Aug. 9, 2021) (citing *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (noting that deployment of chemical agent "mere inches away from the face" of non-resisting individual was unreasonable use of force)). Thus, the Court cannot determine whether the second burst of the chemical agent was necessary to gain Lopez-Delgado's compliance or

was done maliciously or sadistically.

As to Officers Chiz, Badillo, and Dobrzycki, nor can the Court conclude definitively from the video footage the actual amount of force used. Defendants argue that the video shows they were "gently restraining" Lopez-Delgado. ECF No. 36-1 at 14. But the Court is unable to reach any conclusion regarding the degree of pressure being applied by the officers in the video footage. While the video does not confirm the use of unreasonable force, not does it dispel the allegations conclusively.

Notwithstanding, the Court concludes that there is no genuine issue of material fact as to the second, subjective element of the excessive force claim. The video footage shows that Lopez-Delgado began to resist the officers at 6:31 on the tape. *See* Ex. E (manually filed at ECF No. 36-8). The video reveals a close-quarters struggle with Lopez-Delgado strenuously resisting the controlled strip search. However, by 6:50, Lopez-Delgado was secure and was able to raise his chest from the bunk while the officers were instructing him to move his head from side to side to facilitate his breathing. Thus, excessive pressure, if any, was applied for less than twenty seconds. The Court discerns no evidence to support Lopez-Delgado's inference that these Defendants acted maliciously or sadistically while attempting to restrain him. No reasonable fact finder could conclude otherwise. The motion for summary judgment as to Officers Chiz, Badillo, and Dobrzycki is GRANTED.

*Qualified Immunity*

Defendants last contend that, even if the force used was excessive, they are entitled to qualified immunity. Qualified immunity "shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond,* 595 U.S. 9, 12 (2021)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815–16 (2009). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042, 2044 (2015). "Rights must be clearly established in a 'particularized' sense, rather than at a high level of generality, *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017), and while "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

"Therefore, an official is entitled to qualified immunity if, considering the law that was clearly established at the time, the official's conduct was 'objectively legally reasonable.'" *Nazario v. Thibeault*, No. 3:21-cv-216 (VLB), 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella*, 599 F.3d at 133). "The objective reasonableness of an official's conduct 'is a mixed question of law and fact.'" *Id.* "At the summary judgment stage, while a conclusion that an official's conduct 'was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder.'" *Id.*

### Officers Chiz, Badillo, and Dobrzycki

Defendants argue that the force used was "restricted in scope and time," ECF No. 36-1 at 21, and therefore that these officers are entitled to qualified immunity because there is no case

14

finding an Eighth Amendment violation for this conduct under similar circumstances. The Court agrees. Even if a material issue of fact remained as to the nature or necessity of the force used, it was objectively reasonable for these Defendants to believe their conduct was not unlawful at the time. *See Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015). The motion for summary judgment is as to Officers Chiz, Badillo, and Dobrzycki is GRANTED on this alternative ground as well.

### Captain Watson

There are no Supreme Court or Second Circuit decisions which clearly establish parameters for the use of a chemical agent on an uncooperative and resisting inmate. As a result, courts in the Second Circuit have generally granted qualified immunity to officers who used a chemical agent against individuals who were actively resisting or posing a threat to officers. *See Kerr v. DelPeschio*, No. 3:19-cv-988 (VAB), 2024 WL 148241, at *10 (D. Conn. Jan. 12, 2024) (citing cases). Qualified immunity is "routinely denied," however, where the individual is not actively resisting the officers or has been sufficiently restrained. *Id.* (citing cases). The video footage depicts Lopez-Delgado actively resisting the officers even though he was restrained with his hands cuffed behind his back. And as discussed above, it appears that the two deployments of the chemical agent occurred between the 6:33 and 6:40 on the video. Lopez-Delgado was clearly resisting when Captain Watson first leaned under the bunk with the chemical agent.

Whether Captain Watson is protected by qualified immunity turns on whether the use of the chemical agent a second time was for purposes of controlling Lopez-Delgado, or whether it was gratuitous under the circumstances. The video footage has only an obstructed view of the events leading up to the deployment. Thus, the Court cannot determine whether the second burst was reasonably necessary because Lopez-Delgado turned his face away from the first burst, or

whether the second burst was gratuitous and therefore, by inference, malicious or sadistic. This question of fact precludes a finding, as a matter of law that Captain Watson is entitled to qualified immunity. *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain. . . ."). The motion for summary judgment is denied as to this ground with respect to Captain Watson.

**Conclusion**

Defendants' motion for summary judgment is GRANTED as to Defendants Chiz, Badillo, and Dobrzycki and DENIED as to Captain Watson. (ECF No. 36) The Clerk of the Court is directed to terminate Defendants Chiz, Badillo, and Dobrzycki.

**SO ORDERED** at Bridgeport, Connecticut, this 10th day of June 2024.

                                                    */s/ Kari A. Dooley*
                                                  KARI A. DOOLEY
                                                  UNITED STATES DISTRICT JUDGE